

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 13, 2025**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT L.P.,** | § | **BANKR. CASE NO. 19-34054-SGJ-11** |
| | § | **(CHAPTER 11)** |
| *Reorganized Debtor.* | § | |
| _____ | § | |
| **CHARITABLE DAF FUND, L.P.** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **ADV. PRO. NO. 24-03073-sgj** |
| | § | |
| **ALVAREZ & MARSAL CRF MANAGEMENT, LLC,** | § | |
| | § | |
| *Defendant.* | § | |

## <u>MEMORANDUM OPINION AND ORDER DENYING MOTION TO REMAND OF CHARITABLE DAF FUND, L.P.</u>

### I.    INTRODUCTION

Before this court is a motion to remand ("Motion to Remand") the above-referenced

adversary proceeding (the "Action") back to the 116th Judicial District Court of Dallas County,

Texas[1] ("State Court"), where it was originally filed.  The removing party (the Defendant) alleges

that the Action is at least "related to" the Chapter 11 bankruptcy case of *In re Highland Capital*

*Management, L.P.* ("Highland" or sometimes the "Debtor" or the "Reorganized Debtor").  The

Plaintiff, which seeks remand, disagrees.  The Highland Chapter 11 case is now in a post-

confirmation stage (in fact, it has been since year 2021).  Thus, careful analysis is required as to

whether bankruptcy subject matter jurisdiction exists.

The Plaintiff also argues that the Defendant did not timely file its notice of removal and

that the principles of abstention under 28 U.S.C §§ 1334(c) and 1452 apply here.

For the reasons set forth below, the court has determined that the Motion to Remand should

be denied.  Subject matter jurisdiction exists, the notice of removal was timely, and abstention is

not required or appropriate.

## II.    THE PARTIES, BACKGROUND, AND PROCEDURAL HISTORY

*A.  The Parties.*

<u>Plaintiff.</u>  As noted, the Plaintiff in this Action is the one seeking remand to the State Court.

Plaintiff is Charitable DAF Fund, L.P.  ("DAF" or "Plaintiff), an organization founded by, advised

by, and believed to be controlled by James Dondero ("Dondero")—the founder and former Chief

Executive Officer ("CEO") of Highland.  It has been represented often during the Highland

bankruptcy case that DAF is but one of the approximately 2,000 entities in the Highland umbrella

of companies that did not file bankruptcy along with Highland.  DAF is not a section 501(c)(3)

non-profit entity but, rather, is "an exempted company" incorporated in the Cayman Islands.

<u>Defendant</u>.  The Defendant, which removed the Action to the bankruptcy court and now

opposes remand, is Alvarez & Marsal CRF Management, LLC ("Alvarez & Marsal" or

---

[1] Cause No. DC-22-10107.

"Defendant"), a financial advisory firm—a firm wholly unrelated to the Highland complex of companies. Alvarez & Marsal became entangled with Highland prepetition (in or around year 2016), when Alvarez & Marsal became the successor-investment manager for four funds (the "Crusader Funds"—which are later defined herein) that were formerly managed by Highland.  The "Crusader Funds" went into liquidation mode, after the investors in those funds became crossways with Highland and terminated Highland as the investment manager of the "Crusader Funds." That's when Alvarez & Marsal stepped in as investment manager.

The Nature of the Action.  DAF alleges that it was an investor in one of the Crusader Funds. In its original and first amended petition filed in the Action (in 2022), DAF argued that Alvarez & Marsal, in its role as successor-investment manager, wrongly withheld certain distributions to DAF in 2021.  With regard to the withheld distributions, Alvarez & Marsal has taken the position that it was simply relying upon a provision in a prepetition arbitration award from May 2019, entered against Highland, that had directed that DAF's investment interest be extinguished as wrongfully acquired (and a bankruptcy court settlement in October 2020, that incorporated and approved this very same term of the arbitration award). In any event, on February 17, 2023, Alvarez & Marsal, desiring to avoid "the headache and expense of litigation," caused the Crusader Funds[2] to distribute $951,060.82 to Plaintiff, representing the entirety of distributions that had previously been withheld from Plaintiff, and Alvarez & Marsal also agreed to include Plaintiff in all future distributions to Crusader Funds investors. Alvarez & Marsal apparently assumed that Plaintiff would declare victory and dismiss the Action as moot at that point, but Plaintiff continued with the Action, by amending its petition to broaden the allegations and continuing to pursue extensive discovery. [3]

---

[2] That is, Crusader Fund II.
[3] See Ex. 3, Notice of Removal, Dkt. No. 1-3, at 79.

Later, in its Second Amended Petition (filed on August 28, 2024), the Action morphed to add theories that Alvarez & Marsal also "abdicated its responsibilities" as investment manager by: (i) not opposing the bankruptcy court-approved settlement agreement in October 2020 that set the amount of the Crusader Fund's allowed claim in the Highland bankruptcy case (such settlement was almost entirely consistent with the May 2019 prepetition arbitration award and was widely noticed—including to DAF—and was hotly contested[4] and only approved after extensive evidence); and (ii) permitting or participating in the Crusader Funds' sale of their allowed unsecured claims against Highland to third party claims buyers post-petition (in fact, the sale occurred post-confirmation, in April 2021).

### B. Highland's Bankruptcy Case

It is noteworthy that this Action is one of many that have been filed *after* confirmation of a chapter 11 plan in the bankruptcy case of Highland.  Highland was co-founded in Dallas in 1993 by Dondero and Mark Okada ("Okada").  It operated as a global investment adviser that provided investment management and advisory services and managed billions of dollars of assets, both directly and indirectly through numerous affiliates.  On October 16, 2019 (the "Petition Date"), Highland, with Dondero in control[5] and acting as its CEO, president, and portfolio manager, and facing a myriad of massive, business litigation claims—many of which had finally become or were about to be liquidated after a decade or more of contentious litigation in multiple fora all over the world—sought chapter 11 bankruptcy relief in Delaware. The bankruptcy case was transferred to the Northern District of Texas, Dallas Division in December 2019.  Shortly thereafter, Dondero was ousted as CEO and president of Highland, and an independent board of directors was

---

[4] The largest creditor in the Highland case, UBS Securities LLC together with UBS AG, London Branch ("UBS"), contested the settlement and later appealed the bankruptcy court's approval of the settlement (UBS dismissed its appeal with prejudice on June 14, 2021).

[5] Mark Okada resigned from his role with Highland prior to the Petition Date.

appointed to manage Highland's reorganization.   James Seery, Jr. ("Seery") was one of the independent directors who became Highland's CRO and later CEO (prior to confirmation of Highland's Chapter 11 plan) and then the Claimant Trustee of the Claimant Trust created under the terms of the Chapter 11 plan.  Highland's Chapter 11 plan ("Plan") was confirmed in February 2021.

Since confirmation of the Plan, hundreds of millions of dollars have been paid out to creditors under the Plan.  The claims of the largest creditors in the bankruptcy case (with claims asserted in the aggregate of more than one billion dollars) were successfully mediated and incorporated into the Plan—a plan which was ultimately accepted by the votes of an overwhelming majority of Highland's non-insider creditors.  This included a settlement of claims asserted by the "Crusader Funds" (which Alvarez & Marsal managed) against Highland, of which DAF now complains in its Action.  The settlement involving the "Crusader Funds" will be discussed in greater detail below.

Dondero and entities under his control were the only parties who appealed the bankruptcy court's order confirming the Highland Plan (the "Confirmation Order"), and Dondero and entities under his control have been the appellants in virtually every appeal (of which there have been several dozen) that has been filed regarding the Highland bankruptcy case.  Petitions for writs of mandamus (which have been denied) have been filed in the district court, the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit"), and the United States Supreme Court by some of these same entities.  The Plan was never stayed; it went effective on August 11, 2021 ("Effective Date"), and it was affirmed almost in its entirety by the Fifth Circuit, in late summer 2022, including approval of the so-called "Gatekeeper Provision" therein (as later further defined).  As the Fifth Circuit recognized in affirming confirmation of the Plan, the "Gatekeeper Provision"

(along with the other "protection provisions" in the Plan) had been included in the Plan to address the "continued litigiousness" of Dondero that began prepetition and escalated following the post-petition "nasty breakup" between Highland and Dondero, by "screen[ing] and prevent[ing] bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness."[6]  The parties protected by the Gatekeeper Provision under the terms of the Plan, as affirmed by the Fifth Circuit, included: Highland; Seery, in his capacity as CEO/CRO of Highland and as the Claimant Trustee of the Claimant Trust; the independent directors; and the Official Committee of Unsecured Creditors ("UCC") and the members of the UCC and their "Related Persons[,]" which includes such persons' "financial advisors, attorneys, accountants, investment bankers, consultants, professionals, [and] advisors . . . ."[7]

Even with the Gatekeeper Provision of the Plan, Dondero has continued to file numerous lawsuits post-confirmation, either directly or through entities he controls, including this Action filed by DAF.  Each time, the bankruptcy court must analyze whether the Gatekeeper Provision or other orders of the bankruptcy court are implicated.  Such is the situation now before the court.

C.  *The Crusader Funds, the Redeemer Committee, Alvarez & Marsal's Role, and the Rule 9019 Settlement Involving Them All.*

The court begins its analysis here with some important context that is necessary to understand who the above-referenced entities are and whether bankruptcy subject matter jurisdiction might exist over the Action. Recall that one of the new theories of DAF's Action (asserted in the Second Amended Petition, filed in August 2024) is that Alvarez & Marsal "abdicated its responsibilities" as investment manager by not opposing a bankruptcy court-

---

[6] *See NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419, 427, 435 (5th Cir. 2022).

[7] *See* Plan, Art. I.B(105) and (112).

approved settlement agreement in October 2020 that set the amount of the Crusader Fund's allowed claim in the Highland bankruptcy case.  What does this exactly mean?

The Reorganized Debtor, Highland, was, for several years, the investment manager of the "Crusader Funds," which were formed between 2000 and 2002.  The "Crusader Funds" included the following entities:  Highland Crusader Offshore Partners, L.P.; Highland Crusader Fund, L.P., an "onshore" fund; Highland Crusader Fund, Ltd., an offshore fund; and Highland Crusader Fund II, Ltd., also an offshore fund ("Crusader Fund II").  In October 2008, there was a worldwide financial crisis ongoing, and Highland had been overwhelmed with redemption requests from numerous investors in the Crusader Funds. In response, Highland placed the Crusader Funds in wind-down and sought to liquidate the assets of, and make distributions to the investors in, the Crusader Funds.  However, disputes arose over these distributions and an investor accused Highland of misconduct.  Investors in the Crusader Funds subsequently commenced litigation alleging breach of fiduciary duty claims against Highland, based on allegations that Dondero had refused to make mandated distributions and honor redemption requests and traded the funds' positions in a manner designed to render them illiquid in order to deter future redemptions, which led to multiple disputes among redeeming investors. This was all resolved in July 2011, with the adoption of a *Joint Plan of Distribution of the Crusader Funds* (the "Crusader Plan") and a *Scheme of Arrangement Between the Crusader Funds and Their Scheme Creditors* (the "Crusader Scheme," and, together with the Crusader Plan, the "Crusader Plan and Scheme").

At this point, the "Redeemer Committee" entered the picture. As part of the Crusader Plan and Scheme, a committee referred to as the "Redeemer Committee" was elected from the Crusader Funds' investors to oversee the wind-down and management of the Crusader Funds (which were still being managed by Highland) and to resolve certain disputes arising in connection with the

Crusader Funds' wind-down proceedings.  The Redeemer Committee's members consisted of some, but not all, of the investors in the Crusader Funds.  For example, DAF (as a reminder, the Plaintiff in this Action) was an investor in Crusader Funds II, but it was not a member of the Redeemer Committee. Ultimately, disputes evolved between the Redeemer Committee and Highland, and this led to the Redeemer Committee's termination of Highland as the investment manager of the Crusader Funds (as of August 4, 2016, as of a notice dated July 5, 2016).  The disputes led to multi-theater litigation (including in Delaware, Bermuda, and the Cayman Islands)—the most significant of which was an arbitration action commenced on July 5, 2016, by the filing of a Notice of Claim with the American Arbitration Association (the "AAA") (the "Arbitration"),[8] in which the Redeemer Committee asserted various claims against Highland arising from Highland's service as the investment manager for the Crusader Funds. Alvarez & Marsal (as a reminder, the Defendant in this Action) took over as investment manager for the Crusader Funds at this time.  An arbitration panel (convened by the International Centre for Dispute Resolution, International Arbitration Tribunal)[9] held a nine-day evidentiary hearing in September 2018, that included testimony from eleven fact witnesses and four expert witnesses and ultimately awarded the Redeemer Committee damages against Highland in the aggregate amount of $190,824,557, including the accrual of pre-judgment interest but before applying any offsets,

---

[8] The Redeemer Committee and Highland subsequently became engaged in additional lawsuits and actions including: (a) Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., Chancery Court, Delaware, C.A. No. 12533-VCG (the "Delaware Action"); (b) Redeemer Committee of the Highland Crusader Fund and Highland Capital Management, L.P., Supreme Court of Bermuda, Civil Jurisdiction, Case No. 01-16-0002-6927 ("Bermuda Action No. 1"); (c) Highland Capital Management, L.P. and Redeemer Committee of the Highland Crusader Fund, Supreme Court of Bermuda, Civil Jurisdiction (Commercial Court), 2017: No. 308 ("Bermuda Action No. 2"); and (d) Redeemer Committee of the Highland Crusader Fund and Highland Capital Management, L.P., Grand Court of Cayman Islands, Financial Services Division, Cause No. 153 of 2019 (CRJ) (the "Grand Cayman Action").

[9] The Panel was comprised of three highly regarded attorneys:  John S. Martin, Jr., a former United States Attorney for the Southern District of New York and a former United States District Court Judge for the Southern District of New York; David Brodsky, a former federal prosecutor and partner at Latham & Watkins and Schulte Roth & Zabel and a Fellow of the American College of Trial Lawyers; and Michael D. Young, one of the most highly-regarded arbitrators in the country who has been a full-time neutral for more than thirty years and who has presided over more than 300 arbitrations, appraisals, or other binding dispute resolution proceedings.

pursuant to: (a) a Partial Final Award, dated March 6, 2019 (the "March Award"), (b) a Disposition

of Application for Modification of Award, dated March 14, 2019 (the "Modification Award"); and

(c) a Final Award, dated May 9, 2019 (the "Final Award," and together with the March Award and

the Modification Award, the "Arbitration Award").   In addition to awarding monetary damages,

the Arbitration Award also provided for, among other things, (i) the cancellation of all limited

partnership interests or shares in the Crusader Funds that were held by Highland, as well as of an

entity called Eames (controlled by Highland), and of DAF.  The Arbitration Award is subject to the

Federal Arbitration Act and The Convention on the Recognition and Enforcement of Foreign

Arbitral Awards.

The Redeemer Committee soon moved in the Delaware Chancery Court for it to confirm

the Arbitration Award.  Highland moved for the Delaware Chancery Court to vacate parts of the

Arbitration Award, arguing that some aspects of it were procedurally improper, but notably not

challenging any of the factual findings, credibility assessments, or substantive legal conclusions

contained in the Arbitration Award.  On the day that the Redeemer Committee's motion to confirm

and Highland's motion to vacate were scheduled for hearing in the Delaware Chancery Court,

Highland filed for bankruptcy (October 16, 2019).

Soon after the Highland bankruptcy case was filed, the UCC was appointed in the Highland

Bankruptcy Case by the United States Trustee.   Not surprisingly, the Redeemer Committee was

appointed as a member of the UCC (not surprisingly since it was the holder of an approximately

$190 million arbitration award).

The Redeemer Committee and the Crusader Funds separately filed proofs of claim in the

Highland case.  Specifically, on April 3, 2020, the Redeemer Committee filed a general unsecured

claim, which was assigned Claim No. 72 in the Claims Register, in the amount of $190,824,557.00

(as of the Petition Date)—representing the Redeemer Committee's damage claim under the Arbitration Award. The Redeemer Committee also alleged entitlement to post-petition interest, attorneys' fees, costs and other expenses that allegedly continued to accrue. The Redeemer Committee additionally asserted an unliquidated claim amount that related to its rights arising under the Arbitration Award to cancel the "limited partnership interests in the Crusader Fund that are (i) held by [Highland] and [DAF] . . ., and (ii) held by Eames, Ltd."[10] The proof of claim identified "Redeemer Committee Highland Crusader Fund" as the creditor filing the claim and was signed by its counsel.

On April 6, 2020, the Crusader Funds filed a separate, general unsecured proof of claim in the amount of $23,483,446.00, consisting of approximately $8.2 million in management fees and $15.3 million in distribution fees, which was assigned in the claims register as Claim No. 81. The rider to Claim No. 81 indicates that it was filed by the Crusader Funds "by and through their authorized investment manager, [Alvarez & Marsal]," and the proof of claim itself states that "payments to the creditor" should be sent to Alvarez & Marsal and was signed by "[c]ounsel to [Alvarez & Marsal], as Investment Manager."[11]

These two proofs of claims—one by the Redeemer Committee and the other by the Crusader Funds—were the subject of a settlement agreement ("Redeemer/Crusader Rule 9019 Settlement") reached during the Highland Bankruptcy Case—specifically, as set forth in the *Debtor's Motion for Entry of an Order Approving Settlements with (A) the Redeemer Committee*

---

[10] Rider to Proof of Claim No. 72, at 2. Note that the Final Award provided, in relevant part, for the cancellation of the limited partnership interests in the Crusader Funds that are (i) held by Highland and DAF that are identified in RC411, and (ii) held by Eames, Ltd. (Final Award ¶¶ F.a.v and F.a.x). The Final Award provided for Highland to transfer or take all necessary steps to cause the transfer of such interests to the Redeemer Committee for the benefit of the Crusader Funds. The Final Award also provided that the Redeemer Committee had the independent right to cause the Crusader Funds to cancel such limited partnership interests.

[11] The Crusader Funds also asserted a right to recover the damages granted under the Arbitration Award, but expressly acknowledged that they would "withdraw this portion of their claim if and to the extent that the Redeemer Committee's claim is allowed."

*of the Highland Crusader Fund (Claim No. 72), and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* (the "Redeemer/Crusader Rule 9019 Motion") that was filed on September 23, 2020, prior to confirmation of Highland's Chapter 11 Plan (confirmation occurred in February 2021). Highland summarized the material terms of the Redeemer/Crusader Rule 9019 Settlement as follows:[12]

- The Redeemer Committee's claim (Claim No. 72) shall be allowed in the amount of $136,696,610.00 as a general unsecured claim;
- The Crusader Funds' claim (Claim No. 81) shall be allowed in the amount of $50,000.00 as a general unsecured claim;
- The Debtor and Eames [Eames, Ltd. was an indirect, wholly owned subsidiary of Highland that had received an interest in the Crusader Funds under circumstances that the Arbitration Panel had found improper] will each (a) consent to the cancellation of certain interests in the Crusader Funds held by them that the [Arbitration] Panel found were wrongfully acquired, and (b) agree that they will not object to the cancellation of certain interests in the Crusader Funds held by the Charitable DAF that the [Arbitration] Panel also found were wrongfully acquired;
- The Debtor and Eames will each acknowledge that they will not receive any portion of the Reserved Distributions, and the Debtor will further acknowledge that, beginning as of the Stipulation Effective Date, it will not receive any payments from the Crusader Funds in respect of any Deferred Fees, Distribution Fees, or Management Fees;
- The Debtor and the Redeemer Committee agreed to a form of amendment to the Cornerstone Shareholders' Agreement and to a process whereby the Debtor shall, in good faith, use commercially reasonable efforts to monetize all shares of capital stock of Cornerstone held by the Debtor, any funds managed by the Debtor, and the Crusader Funds;[13]
- Upon the Stipulation Effective Date, the Parties and the Additional Release Parties shall exchange releases as set forth in the Stipulation; and
- The Debtor shall dismiss Bermuda Action No. 2 with prejudice, and the Redeemer Committee and the Crusader Funds covenant not to prosecute, and shall not prosecute, any of the Redeemer Actions against the Debtor, Eames, or any of the Additional Highland Release Parties.

---

[12] Redeemer/Crusader Rule 9019 Motion, 7-8.

[13] Cornerstone Healthcare Group ("Cornerstone") was an entity that owned hospitals and other healthcare-related entities. Highland directly and indirectly controlled 100% of Cornerstone's common stock, some of which was held by the Crusader Funds. During the Arbitration, the Redeemer Committee established that Highland had breached its fiduciary duty to the Crusader Funds by failing to liquidate the Crusader Funds' shares in Cornerstone. The Arbitration Panel found in favor of the Redeemer Committee on this claim and ordered Highland to purchase the Crusader Funds' shares in Cornerstone at a fixed price of $48,070,407.00, plus pre-judgment interest.

The "Stipulation" (that is, the Redeemer/Crusader Rule 9019 Settlement) entered into between and among Highland, Eames, the Redeemer Committee, and the Crusader Funds was filed in the bankruptcy court as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlements with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72), and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* ("Morris Declaration")[14] and is described as "incorporat[ing] certain compromises between the Debtor, the Redeemer Committee, and the Crusader Funds with respect to, among other things, the disposition of Deferred Fees and the treatment of the Cornerstone Shares held by the Crusader Funds."[15] ***Notably, A&M is specifically identified as a "Crusader Additional Release Part[y]" under the terms of the Redeemer/Crusader Settlement Agreement.*** Each of the Crusader Funds, including Crusader Fund II (in which the Plaintiff, DAF, now asserts it holds an interest), executed the Redeemer/Crusader Rule 9019 Settlement,[16] and Alvarez & Marsal separately executed the Redeemer/Crusader Rule 9019 Settlement on behalf of itself and did not execute the Redeemer/Crusader Rule 9019 Settlement on behalf of any of the Crusader Funds or the Redeemer Committee.

The bankruptcy court held a hearing ("Hearing") on the Redeemer/Crusader Rule 9019 Motion on October 20, 2020. Numerous parties (including Dondero) had objected to a totally unrelated settlement motion that was set for a hearing at that same time (i.e., a settlement involving Acis Capital Management L.P.), but there was only one objection to the Redeemer/Crusader Rule

---

[14] *See* Bankr. Dkt. No. 1090.

[15] Redeemer/Crusader Rule 9019 Motion, 8.

[16] Mark S. DiSalvo signed for Crusader Fund II as its "Authorized Signatory."

9019 Settlement, and that objection was filed and prosecuted by UBS.[17]   UBS was a member of

the UCC in the Highland case that had filed a proof of claim against Highland in the amount of

over $1 billion.[18]   UBS objected to the proposed Redeemer/Crusader Rule 9019 Settlement on the

basis that Highland had not met its burden of showing that it was "a fair and equitable compromise

within the range of reasonable alternatives."[19]   More specifically, UBS argued that Highland under-

estimated its chances of success in contesting the Redeemer Committee's proof of claim,

overestimated the complexity of the "litigation" being settled, and undervalued what Highland was

"giving up" in forfeiting its rights to receive the Deferred Fees and the Crusader Funds' interests

in Cornerstone shares.[20]   UBS argued that the proposed settlement was not in the best interests of

***all*** of the creditors but instead was only in the best interests of the Redeemer Committee.   In other

words, UBS had argued that the Redeemer/Crusader Rule 9019 Settlement favored and benefited

the Redeemer Committee over all of the estate's other unsecured creditors (which, of course,

included UBS). But, notably,  DAF did not object to the Redeemer/Crusader Rule 9019 Motion or

appear at or participate in the Hearing to voice any objection to the proposed Redeemer/Crusader

---

[17]   *See Objection to the Debtor's Motion for Entry of an Order Approving Settlements with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72), and (B) the Highland Crusader Funds (Claim No. 81)* ("UBS Objection"), Bankr. Dkt. No. 1190.

[18] As described in the Confirmation Order, at 9:

> The UBS Claim was based on a judgment that UBS received from a New York state court in 2020. The underlying decision was issued in November 2019, after a multi-week bench trial (which had occurred many months earlier) on a breach of contract claim against non-Debtor entities in the Highland complex. The UBS litigation related to activities that occurred in 2008 and 2009. The litigation involving UBS and Highland and affiliates was pending for more than a decade (there having been numerous interlocutory appeals during its history). The Debtor and UBS [at the time of confirmation, had] recently announced an agreement in principle for a settlement of the UBS claim (which came a few months after Bankruptcy Court ordered mediation) which w[ould] be subject to a 9019 motion to be filed with the Bankruptcy Court [post-confirmation].

[19] UBS Objection, 1.

[20] Under the Arbitration Award and Crusader Plan and Scheme, the Redeemer Committee had been obligated to transfer "meaningful assets"—the Deferred Fees and Cornerstone shares—to Highland's estate, and "[u]nder the Proposed [Redeemer/Crusader Rule 9019] Settlement, Redeemer [Committee] is relieved of those obligations, and the Debtor forfeits the estate's rights to those assets." *See* UBS Objection, 10-11.

Rule 9019 Settlement.[21]  Highland's counsel argued in his opening statement that "there will be

no dispute that this negotiation was arm's length, it was not the product of fraud or collusion, and

that it is in the paramount interest of the Debtor and its estates and all constituents that this litigation

with the Redeemer Committee finally be brought to an end."[22] Highland's counsel further argued,

following the presentation of evidence by the Debtor, the Redeemer Committee, and UBS, that the

evidence showed that "the settlement is truly the product of arm's-length bargaining" and that

"there is no evidence of fraud [or] collusion."[23]    At the end of the Hearing on the

Redeemer/Crusader Rule 9019 Motion, the bankruptcy court overruled UBS's objection and

approved[24] the Redeemer/Crusader Rule 9019 Settlement, noting that proper notice had been

given, and noting the legal standards under Fifth Circuit jurisprudence that a bankruptcy court is

supposed to use when considering a motion under Rule 9019 to approve a compromise of a

controversy:

> [T]he Court has to evaluate whether the compromise and settlement is fair and
> equitable and in the best interest of creditors when considering three things:  One,
> the probability of success on the merits in future litigation, with due consideration
> for uncertainty of law and fact; two, the complexity and likely duration of litigation
> and any attendant inconvenience and delay; and three, all other factors bearing on
> the wisdom of the compromise.  The Court is also supposed to consider the
> paramount interests of the creditors.[25]

In approving the Redeemer/Crusader Rule 9019 Settlement, the bankruptcy court found that it was

"eminently reasonable, fair and equitable, [and] in the best interest of creditors."[26]  The court also

found that "there were good-faith arm's-length negotiations" with respect to the terms of the

---

[21] The transcript of the Hearing (Transcript of 9019 Hearing") was docketed in the main bankruptcy case at docket
number 1271.

[22] Transcript of 9019 Hearing, 21:20-25.

[23] Transcript of 9019 Hearing, 145:19-20; 146:2-3.

[24] *See generally* Transcript of 9019 Hearing, 163:13-167:8.

[25] Transcript of 9019 Hearing, 163:18-164:10.

[26] Transcript of 9019 Hearing, 164:12-16.

settlement, thus rejecting UBS's suggestion that there had been fraud and collusion among and between the parties to the settlement that resulted in the settlement being "only in the best interests of Redeemer" and not in the best interests of the "other general unsecured creditors." The court entered its order approving the Redeemer/Crusader Rule 9019 Settlement on October 23, 2020. UBS timely filed an appeal of the order approving the Redeemer/Crusader Rule 9019 Settlement; DAF did not.

One footnote, of sorts, with regard to the Redeemer/Crusader Rule 9019 Settlement, has to do with an entity known as CLO Holdco Ltd. ("CLO Holdco"), which is a wholly owned subsidiary of DAF. Until Dondero's departure from Highland in January 2020, Highland (through Dondero) effectively made all investment decisions for the DAF which allocated those investments to CLO Holdco. Interestingly, on April 8, 2020, CLO Holdco filed Proof of Claim No. 133 in the Highland bankruptcy case, seeking approximately $11 million (the "CLO Holdco Proof of Claim"). The basis of the CLO Holdco Proof of Claim was that CLO Holdco purchased a participation interest in certain interests that Highland held in the Crusader Funds. Highland acquired the interests in the Crusader Funds that are the subject of the CLO Holdco Proof of Claim in violation of the Crusader Plan and Scheme. Highland released its claim on those interests in connection with Redeemer/Crusader Rule 9019 Settlement. Accordingly, CLO Holdco would not have been entitled to any value on account of the CLO Holdco Proof of Claim. Apparently, in recognition of this fact, on October 21, 2020, CLO Holdco amended its proof of claim to seek $0. Yet DAF, CLO Holdco's parent, is taking the position it still has an interest in the Crusader Funds.

In any event, the Redeemer/Crusader Rule 9019 Settlement, along with settlements with most of Highland's other major unsecured creditors, including a settlement with Acis Capital

Management, L.P.[27] and a settlement reached with UBS just prior to confirmation ("UBS Settlement"),[28] ***became an integral component of Highland's Plan***.[29]   In its Confirmation Order, the bankruptcy court described the UCC in the Highland bankruptcy case as "not your garden variety creditor's committee," as mostly consisting of counterparties to massive litigation that had occurred over "a decade or more of contentious litigation in multiple forums all over the world" and agreed with the UCC's description of Dondero as a "serial litigator."[30]   The court went on to describe the members of the UCC ("and their history of litigation with the Debtor and others in the Highland complex") and referenced the Redeemer/Crusader Rule 9019 Settlement, the Acis Settlement, and the agreement in principle to settle UBS's billion dollar claim, subject to a future Rule 9019 motion.[31]   The court described the members of the UCC as having "wills of steel" and having "fought hard before and during this Chapter 11 Case."   The court went on to make a finding that the members of the UCC (which included the Redeemer Committee), "all of whom have volunteered to serve on the Claimant Trust Oversight Board post-confirmation, are highly sophisticated and have had highly sophisticated professionals representing them" and that "[t]hey have represented their constituency in this case as fiduciaries extremely well."

   D.   *The Post-Petition/Post-Confirmation Claims Trading Theory—and the Many Attempts at Litigating it.*

   The court provides still more context that is important to understand whether bankruptcy subject matter might exist here.   Recall that, in DAF's Second Amended Petition (filed in the

---

[27] The court entered an order approving the Acis Settlement, overruling all objections thereto, including Dondero's objection, on October 28, 2020. Bankr. Dkt. No. 1347.

[28] The UBS Claim was ultimately settled and approved by the bankruptcy court following the filing by Highland of a post-confirmation Rule 9019 motion.

[29] The Redeemer/Crusader Rule 9019 Settlement, as well as the Acis Settlement, were described in detail, in the Highland Disclosure Statement. Disclosure Statement, 28-29.

[30] Confirmation Order, 8-9.

[31] Confirmation Order, 9-10.

Action on August 28, 2024), the Action morphed to add a theory that Alvarez & Marsal "abdicated its responsibilities" as investment manager by permitting or participating in the Crusader Funds' sale of their allowed unsecured claims ("Claims Trading") against Highland to third parties claims buyers, which occurred post-petition—in fact, two months after confirmation, in April 2021 (the "Claims Trading Theory").  What does this mean?

     <u>HMIT Litigation Regarding Claims Trading</u>.  Well, as it turns out, the aforementioned Claims Trading Theory was at the heart of ***another*** post-confirmation contested matter in the bankruptcy court recently—specifically, an emergency motion filed by ***another*** Dondero-controlled entity known as Hunter Mountain Investment Trust ("HMIT"), which is a former equity interest holder of Highland.  In that contested matter, HMIT sought leave to file an adversary proceeding against Seery for alleged breaches of fiduciary duty in connection with the post-confirmation Claims Trading ("Motion to Sue Seery Regarding Claims Trading"). This Motion to Sue Seery Regarding Claims Trading required the bankruptcy court to sort through the Plan's Gatekeeper Provision—and how and whether to apply it since Seery (a party clearly protected by the Gatekeeper Provision) was a party that HMIT wanted to sue regarding the Claims Trading. The court denied HMIT permission to sue over the Claims Trading on the basis that: (1) HMIT would lack constitutional standing to bring the proposed claims (because HMIT was not a vested interest holder under the confirmed Plan); (2) even if HMIT would have constitutional standing to pursue the proposed claims, it would lack prudential standing to bring the proposed claims (same reason); and, further, (3) even if HMIT would have both constitutional standing and prudential standing to bring the proposed claims, it had not met its burden of showing that its proposed claims

were "colorable" claims as is required under the Gatekeeper Provision.[32]   In denying HMIT's

Motion to Sue Seery Regarding Claims Trading, the bankruptcy court concluded that Dondero was

"the driving force" behind HMIT's Motion to Sue Seery Regarding Claims Trading and that the

Motion to Sue Seery Regarding Claims Trading "[wa]s just one more attempt by Dondero to press

his conspiracy theory [involving Seery and the claims purchasers relating to the Claims Trading],

that he ha[d] pressed for over two years [then], unsuccessfully, in Texas state court through Rule

202 proceedings, with the Texas State Securities Board, and with the United States Trustee's

office."[33]

<u>HMIT's and Dondero's Rule 202 Proceedings in State Court</u>.  What were the Rule 202

proceedings the bankruptcy court was referring to, in the above-mentioned Order Denying HMIT's

Motion for Leave?  The bankruptcy court was referring to the fact that HMIT's Motion to Sue

Seery Regarding Claims Trading was filed after two years of unsuccessful attempts by, first,

Dondero personally, and then HMIT to obtain pre-suit discovery from certain proposed defendants

(i.e., the claims purchasers in the Claims Trading transactions) through two different Texas state

court proceedings, pursuant to Tex. R. Civ. P. 202 ("Rule 202").  And, in each of these Rule 202

proceedings, Dondero and HMIT had espoused the same Seery/Claims Purchasers conspiracy

theory espoused in the Motion to Sue Seery Regarding Claims Trading—that Seery, along with

Alvarez & Marsal and other claim holders, had developed and executed a nefarious scheme to sell

certain bankruptcy claims below market value.  Presumably in the hopes of substantiating this

---

[32] *See Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation Gatekeeper Orders": Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding* ("Order Denying HMIT's Motion for Leave"), Bankr. Dkt. No. 3904.  HMIT appealed this order, and the appeal is currently pending in the district court.

[33] Order Denying HMIT's Motion for Leave, 42.

theory, Dondero crafted document requests and deposition topics aimed principally at obtaining

information related to the settlement and subsequent sale of those claims.

The first Rule 202 proceeding was brought by Dondero against Alvarez & Marsal and

Farallon (the purchaser of the Redeemer Committee/Crusader Funds Claims), and they removed

the proceeding to the bankruptcy court pursuant to the bankruptcy removal statute,

28 U.S.C. § 1452. Dondero filed a motion to remand the proceeding, which the court granted with

"grave misgivings" given its intimate knowledge of the bankruptcy proceedings, claims trading in

bankruptcy, the fiduciary duties of creditors' committees and their members, and the fact that

Dondero's recent litigation maneuvers were "highly suspect." In other words, the court remanded

***not*** because it found that the matter was not related to the Highland bankruptcy case or that the

court would not have had post-confirmation jurisdiction over the proceeding, but because the court

concluded that the Rule 202 proceeding was not a "civil action" that was removable under

§ 1452.[34] The bankruptcy court had described Dondero's efforts in the Rule 202 proceedings as

"seek[ing] to investigate the sale of the proofs of claim by the Redeemer Committee through its

investment manager, [Alvarez & Marsal], as well as the sale of other proofs of claim to Jessup

Holdings or Muck Holdings" and stated that "[i]t appears that Dondero may be seeking discovery

as a means to craft a lawsuit against Seery (as well as Farallon and Alvarez)" despite having been

previously sanctioned, along with related parties including DAF when they attempted to add Seery

to a lawsuit filed in the United States District Court for the Northern District of Texas in violation

of this court's prior gatekeeping orders,[35] before observing that "if the Rule 202 Proceeding [were

---

[34] *See Memorandum Opinion and Order Granting James Dondero's Motion to Remand Adversary Proceeding to State Court, Denying Fee Reimbursement Request, and Related Rulings* ("2022 Remand Order"), Adv. Pro. 21-3051, Dkt. No. 22, at 20-21. The court noted that "[i]f judicial efficiency and economy were the only considerations that mattered here, clearly remand would ***not*** be the correct result."

[35] 2022 Remand Order, 5-6.

to] lead[ ] to any civil suit, [it] may ultimately be 'related to' the Highland confirmed plan and the issue may be raised in that civil suit."[36]

On remand, the Texas State Court denied Dondero's Rule 202 petition. Then HMIT filed a second Rule 202 petition, seeking the very same information, which was also denied by the Texas State Court. It was shortly after HMIT's Rule 202 petition was denied that it filed the above-mentioned Motion to Sue Seery Regarding Claims Trading.

### E.  The Removed Action

The Action (which—to be clear—is only against Alvarez & Marsal) was filed in 2022 by the plaintiff, DAF, just two months after the Texas State Court dismissed the Rule 202 petition against Alvarez & Marsal and Farallon. In the Action, DAF asserts claims against Alvarez & Marsal for alleged breaches of fiduciary duty, conversion, and tortious interference—all in connection with Alvarez & Marsal's role as successor-investment manager of the Crusader Funds—and, in particular, regarding its allegedly not acting appropriately in connection with the Redeemer/Crusader Rule 9019 Settlement during the Highland bankruptcy case and also in connection with the Claims Trading that occurred during the bankruptcy case. DAF alleges to be asserting its personal/direct causes of action as an investor in the Crusader Funds (Fund II), not some claim that it might hold derivatively as an allegedly creditor/former creditor of Highland or as a Plan beneficiary somehow.

On September 13, 2024, Alavarez & Marsal removed the Action pursuant to 28 U.S.C. § 1452(a), which provides, "A party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district

---

[36] 2022 Remand Order, 21.

court has jurisdiction of such claim or cause of action under section 1334[.]"  Alvarez & Marsal based its removal on this court having "related to" bankruptcy jurisdiction under § 1334.

DAF filed its *Motion to Remand* on October 14, 2024 (and brief in support),[37] arguing the court must remand the proceeding back to the Texas State Court because the court does not have post-confirmation "related to" jurisdiction over the Action.  In addition, DAF argues that its Motion to Remand should be granted because Alverez & Marsal's removal was untimely and because the principles of permissive and mandatory abstention apply.

Alvarez & Marsal filed its Response Brief on November 4, 2024, in which it argues that the Action was properly removed and that the Motion for Remand should be denied because (1) this court does have "related-to" jurisdiction over this post-confirmation action because DAF alleges injuries arising from Alvarez & Marsal's conduct prior to confirmation (at least with regard to the Redeemer/Crusader Rule 9019 Settlement) and the claims in DAF's Second Amended Petition "will almost inevitably lead to a breach of the Plan's Gatekeeper provision;" (2) the court is not required to abstain under § 1452, (3) the Notice of Removal was timely because it was DAF's Second Amended Petition that was the "initial pleading" referenced in Rule 9027(a)(3) that made the case removable and none of the DAF's discovery requests made in the Action (before the filing of the Second Amended Petition) made the case removable; and, (4) no equitable grounds exist to justify remand of any of DAF's claims.

DAF filed its *Reply Brief in Support of Motion to Remand* ("Reply Brief") on November 18, 2024, and a hearing was held on the Motion to Remand on November 25, 2024.

---

[37] Motion to Remand, Dkt. No. 3.  DAF's brief in support of its Motion to Remand ("Remand Brief") was filed as an attachment to the Motion to Remand, Dkt. No. 3-1.

### III.    LEGAL ANALYSIS

*A.  The Court's Subject Matter Jurisdiction Over the Removed Action*

The threshold question for this court to decide is whether it has bankruptcy subject matter jurisdiction over this post-confirmation dispute. As this court explained in *In re Brooks Mays Music Co.*, a district court (and, by referral, a bankruptcy court) has original, but not exclusive jurisdiction over "civil proceedings that are 'arising under' the Bankruptcy Code, or 'arising in' bankruptcy cases, or are 'related to' bankruptcy cases."[38] Removal, pursuant to 28 U.S.C. § 1452(a), is proper if the bankruptcy court would have subject matter jurisdiction over the claims asserted in the action pursuant to 28 U.S.C. § 1334(b).[39] The Fifth Circuit has acknowledged that Section 1334 does not expressly limit a bankruptcy court's post-confirmation jurisdiction.[40] Despite no Congressional limitation on a bankruptcy court's post-confirmation jurisdiction, the Fifth Circuit has opined that bankruptcy subject matter jurisdiction does not last forever and has generally narrowed its post-confirmation jurisdiction to matters that bear on the implementation or execution of the plan.[41]  The *Craig's Stores* case was the first Fifth Circuit case that articulated the post-confirmation test for narrowed bankruptcy subject matter jurisdiction.  It involved a contractual dispute that erupted 18 months after confirmation—and this late timing of the post-confirmation dispute eruption was the main problem.  The Fifth Circuit held there was no bankruptcy subject matter jurisdiction there and that an emancipated debtor may not come running back to a bankruptcy court every time something unpleasant happens. The Fifth Circuit later

---

[38] 363 B.R. 801, 807 (Bankr. N.D. Tex. 2007).

[39] *Id.*

[40] *U.S. Brass Corporation v. Travelers Insurance Group, Inc. (In re U.S. Brass Corporation)*, 301 F.3d 296, 304 (5th Cir. 2002).

[41] *In re GenOn Mid-Atl. Dev., L.L.C.*, 42 F.4th 523, 534 (5th Cir. 2022); *In re Enron Corp. Sec.*, 535 F.3d 325, 335 (5th Cir. 2008)*; Craig's Stores of Tex., Inc. v. Bank of La. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001)*. See also U.S. Brass Corp. v. Travelers Ins. Grp. (In re U.S. Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002); *In re Chesapeake Energy Corporation*, 70 F.4th 273 (5th Cir. 2023).

observed that three factors were critical to the *Craig's Stores* Court's decision: "first, the claims at issue 'principally dealt with post-confirmation relations between the parties;' second, '[t]here was no antagonism or claim pending between the parties as of the date of the reorganization;' and third, 'no facts or law deriving from the reorganization or the plan [were] necessary to the claim.'"[42] The Court more recently observed that this three-factor test really boils down to ***one overarching question***:   Does the dispute "pertain to the implementation or execution" of the debtor's reorganization plan?[43]

Several years later, the United States Supreme Court weighed in regarding post-confirmation bankruptcy subject matter jurisdiction in *Travelers Casualty & Surety Co. of America v. Bailey*.[44]   In that case, the Supreme Court made clear that, while post-confirmation subject matter jurisdiction does not last forever, it can endure for quite a long time.   The Supreme Court explained that even decades after a plan is confirmed, the question of whether a bankruptcy court has subject-matter jurisdiction to interpret its prior orders is "easy"—a bankruptcy court plainly has jurisdiction to interpret and enforce its own prior orders.[45]   Since *Travelers* was decided, the Fifth Circuit has cited to it on several occasions, explaining that "[s]ubject matter jurisdiction remains in the bankruptcy court, even after the bankruptcy case is closed, to assure that the rights afforded to a debtor by the Bankruptcy Code are fully vindicated."[46]

Alvarez & Marsal points out that DAF has acknowledged in its Motion to Remand that "the causes of action at issue in DAF's Second Amended Petition assert claims based on the extent to which Alvarez & Marsal or the Redeemer Committee controlled negotiations and decision-

---

[42] *Enron Corp. Sec.*, 535 F.3d at 335.

[43] *In re GenOn Mid-Atl. Dev.*, 42 F.4th at 534.

[44] 557 U.S. 137 (2009).

[45] *Id*. at 151.

[46] *See, e.g., Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 322 (5th Cir. 2016) (internal citations and quotations omitted).

making concerning the settlement [i.e., the Redeemer/Crusader Rule 9019 Settlement] and sale [i.e., Claims Trading] of the Crusader Funds' bankruptcy claims (the "Bankruptcy Claims")."[47] Alvarez & Marsal also argues that the Action implicates the involvement of Seery, the Reorganized Debtor's CEO.  Essentially, the Action is a pretext to really litigate against Seery, who is a "Protected Party" under the Gatekeeper Provision of the Highland confirmed Plan. Alvarez & Marsal makes a good case that, with certain discovery already being sought by DAF in the Action, it is inevitable that Seery will be drawn at least into discovery, distracted from his role on behalf of the Highland Claimant Trust, and—significantly—entitled to indemnification from the Reorganized Debtor and/or Claimant Trust.  The terms of the Plan, and in particular its Gatekeeper Provision, were specifically designed to protect Seery from harassment such as this (and, the court notes, the Redeemer Committee, in its capacity as member of the UCC, as well), and the bankruptcy court may need to carefully monitor and adjudicate at what point DAF's actions with respect to Seery (and/or the Redeemer Committee) cross the line and breach the Gatekeeper Provision.

DAF argues that because Seery is mentioned nowhere in its Second Amended Complaint and because Seery, himself, has not been served with discovery, it is not "inevitable" that the Action will approach a potential violation of the Gatekeeper Provision, and, therefore, the bankruptcy court does not have post-confirmation jurisdiction over the Action.   But, the Gatekeeper Provision of the Plan is not the only matter being implicated in the Action that might give rise to the bankruptcy court having post-confirmation jurisdiction; there are many bankruptcy court orders that are implicated here that may have preclusive effect in the Action—namely: the bankruptcy court's Redeemer/Crusader Rule 9019 Settlement Order from October 2020; the

---

[47] Motion to Remand, 7.

bankruptcy court's February 2021 Confirmation Order (which incorporated the Redeemer/Crusader Rule 9019 Settlement Order and further ratified it); and the bankruptcy court's Order Denying HMIT's Motion to Sue Seery Regarding Claims Trading[48] dated August 25, 2023 (to which DAF most likely would be considered "in privity," given the significant connection of Dondero to both entities). Moreover, application of the *Enron* factors weigh in favor of finding post-confirmation "related to" jurisdiction under *Craig's Stores*: the claims in the Second Amended Petition here principally deal with relations between the parties that occurred pre-confirmation regarding the Redeemer/Crusader Rule 9019 Settlement that became an integral component of Highland's Plan and only later with respect to the post-confirmation sales of the Redeemer Committee/Crusader Funds bankruptcy claims that had been allowed under that settlement. Many of the facts and potentially issues of law that were decided during the bankruptcy case in connection with the settlement and confirmation of the Plan will be necessary to DAF's claims against Alvarez & Marsal in the Action, especially given that DAF's theory of Alvarez & Marsal's breach of fiduciary duty is tied to DAF's (and Dondero's) allegations that Alvarez & Marsal somehow conspired with Seery to undervalue the Redeemer Committee/Crusader Funds' claims in connection with the settlement and subsequent sale of those claims during the pendency of the bankruptcy case[49] and that became integral components of the implementation and execution of the Plan. And, as noted above, while post-confirmation bankruptcy subject matter jurisdiction is often described as being limited to disputes that bear on the implementation or execution of a confirmed plan (at least when defining "related to" bankruptcy jurisdiction), a bankruptcy court always has subject matter jurisdiction to interpret and enforce its own orders and to assure that the

---

[48] Bankr. Dkt. No. 3903.

[49] As earlier noted, the Claims Trading occurred post-confirmation (April 2021) but pre-Effective Date of the Plan. The Plan went effective in August 2021.

rights afforded to a debtor under the Bankruptcy Code are fully vindicated, and consideration of the claims in the Second Amended Petition will necessarily implicate and relate to, at least, this court's prior orders regarding the Redeemer/Crusader Rule 9019 Settlement, confirmation of the Plan, and the Order Denying HMIT's Motion to Sue Seery Regarding Claims Trading requesting leave to file an adversary proceeding regarding the Claims Trading against Seery (and the claims purchasers, including Farallon, the purchaser of the Redeemer Committee/Crusader Funds' bankruptcy claims).  The HMIT Motion to Sue Seery Regarding Claims Trading alleged nefarious conduct and fraudulent activity on behalf of Seery in connection with the same Claims Trading that DAF now alleges Alvarez & Marsal participated in—breaching its fiduciary duty to the Crusader Funds, which participation allegedly began with Alvarez & Marsal's role in representing the Redeemer Committee/Crusader Funds in connection with the Redeemer/Crusader Rule 9019 Settlement.  Déjà vu all over again, to be sure.  For these reasons, the court concludes that it does have post-confirmation over the Action.

*B. Timeliness of Removal*

Federal Rule of Bankruptcy Procedure 9027(a)(3) requires a removing party to file its notice of removal within thirty days of receiving "the initial pleading setting forth the claim or cause of action sought to be removed."   Here, within thirty days of receiving DAF's Second Amended Petition, ***which for the first time alleged new theories implicating the Highland bankruptcy and facts/issues the bankruptcy court had adjudicated—i.e., the Redeemer/Crusader Rule 9019  Settlement, the Plan Confirmation Order incorporating same, and the Order Denying HMIT's Motion to Sue Seery Regarding Claims Trading***—Alvarez & Marsal filed its notice of removal.  DAF's Second Amended Petition was the "initial pleading," as referenced in Rule 9027(a)(3). The thirty-day clock for removing this case began on August 28, 2024—the date

DAF filed its first pleading that contained claims making this Action removable. Because Alvarez & Marsal filed its notice of removal on September 13, 2024, well before that thirty-day clock expired, its removal was timely. DAF's arguments that Alvarez & Marsal was required to remove earlier are not persuasive. No pleading, discovery request, or other paper filed or served in the state court action prior to the Second Amended Petition started the clock for removal. Because Alvarez & Marsal filed its notice of removal on September 13, 2024, well before that thirty-day clock expired, its removal was timely.

### C. Abstention or Equitable Remand

DAF argues that, even if this court has subject matter jurisdiction over this matter, the court must abstain from adjudicating it and remand the proceeding to the State Court for adjudication under the mandatory abstention provisions of 11 U.S.C. section 1334(c)(2) and that, even if the court is not required to abstain, it should exercise its discretion to abstain and remand under the permissive abstention provisions of § 1334(c)(1) and/or equitable remand provisions of § 1452(b). The court disagrees.

Section 1334(c)(2) of the United States Code[50] provides that:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

"The Fifth Circuit has articulated that mandatory abstention applies where (1) the claim has no independent basis for federal jurisdiction, other than § 1334(b); (2) the claim is a non-core proceeding, i.e., it is related to a case under title 11; (3) an action has been commenced in state

---

[50] 28 U.S.C. § 1334(c)(2).

court; and (4) the action could be adjudicated timely in state court."[51] As noted by the Fifth Circuit, "The statute requires abstention only if all four conditions are met."[52]   Moreover, it is the party seeking remand who has the burden of showing that all four conditions are met so as to mandate abstention by the bankruptcy court.[53]   Here, DAF has not met its burden of showing that the claim has no independent basis for federal jurisdiction, other than § 1334(b).   It appears that the parties are completely diverse, and DAF seeks damages over the minimum threshold for diversity jurisdiction.   Nor has DAF met its burden of showing that the claims could be adjudicated on a timely basis in state court.   DAF argues that there is a January 2025 trial setting in state court, and, therefore, the Action could be timely adjudicated there. But, as Alvarez & Marsal points out, this Action had been pending for nearly two-and-a-half years in the state court before the Second Amended Petition was filed.   During those two-and-a half years, DAF's claims have been nearly dismissed for want of prosecution; three separate petitions have been filed; multiple hearings and discovery disputes have transpired; and, there have been two continuances.   And, the outlook for the next stage of this case gives no greater clarity regarding the ability of the State Court to timely adjudicate the claims asserted in the Second Amended Petition.   DAF's recent amendments to its petition added new claims entirely unrelated to those originally pleaded, which will effectively restart the schedule. As Alvarez & Marsal points out, those claims will inevitably require a substantial extension to the discovery schedule and other schedule extensions that account for motions to dismiss, discovery, dispositive motions, expert discovery, and pretrial proceedings.

---

[51] *Cedar Park Healthcare, LLC v. Harden Healthcare, LLC (In re Senior Care Centers, LLC)*, 611 B.R. 791, 800 (Bankr. N.D. Tex. 2019); *see also In re GenOn Mid-Atl. Dev.,* 42 F.4th at 539 (citing 28 U.S.C. § 1334(c)(2) and *In re TXNB Internal Case*, 483 F.3d 292, 300 (5th Cir. 2007)).

[52] *In re GenOn Mid-Atl. Dev.*, 43 F.4th at 539.

[53] *See In re With Purpose, Inc.*, 654 B.R. 715, 729 (Bankr. N.D. Tex. 2023) ("[I]f a motion to abstain is disputed, the burden is on the moving party to show mandatory abstention applies.") (citations omitted); *Guerra & Moore, Ltd., LLC v. Cantu*, 2012 WL 13240304 *4 (S.D. Tex., Feb. 24, 2012) ("The party seeking mandatory abstention carries the burden of establishing these requirements, and the failure to satisfy even one factor will be fatal.") (cleaned up).

The court finds that DAF has not carried its burden of showing that this court must abstain from hearing this matter under § 1332(c)(2).

DAF asks, in its Motion to Remand, that if the court finds mandatory abstention inapplicable here, it exercise its discretion to abstain pursuant to the permissive abstention provisions of § 1334(c)(1) and/or equitably remand under 28 U.S.C. § 1452(b).[54] The court does not find any equitable basis for abstaining here.  As the court observed over two years ago in connection with its order remanding Dondero's Rule 202 proceeding, considerations of "judicial efficiency and economy" counseled *overwhelmingly* in favor of deciding the issues presented in Dondero's Rule 202 petition in the bankruptcy court rather than remanding them to state court.[55] The same observation can be made here.  The issues that are now in dispute as a consequence of DAF's new allegations are precisely those that gave this court "grave misgivings" when it remanded Dondero's Rule 202 petition in 2022.  Only now, these issues have been raised in the context of a removable "civil action" under § 1452.  This court is intimately familiar with prior bankruptcy court orders and facts and circumstances surrounding a bankruptcy court-approved settlement, subsequent sale of bankruptcy claims, and confirmation of Highland's Plan (including whether the pursuit of Alvarez & Marsal by DAF in the Action violates or risks violation of the Gatekeeper Provisions under the Plan)—all of which will be necessary to consider in the Action. In the interest of judicial economy and efficiency, equitable factors weigh in favor of denying the Motion to Remand.

## IV.    CONCLUSION

Having considered the Notice of Removal, the Motion to Remand and Alvarez & Marsal's opposition thereto, the arguments of counsel at the hearing on the Motion to Remand, and for the

---

[54] Remand Brief, 20 n.38.
[55] 2022 Remand Order, 20-21.

foregoing reasons, the court concludes that (1) the Action is "related to" the Highland bankruptcy case, and therefore the federal courts have bankruptcy subject matter jurisdiction over the Action, (2) Alvarez & Marsal's Notice of Removal was timely filed, and (3) the principles of mandatory and permissive abstention (or equitable remand) under 28 U.S.C §§ 1334(c) and 1452 do not require remand of this Action.

Accordingly,

**IT IS ORDERED** that the Motion to Remand be, and hereby is, **DENIED.**

**###END OF MEMORANDUM OPINION AND ORDER###**